1

2                                          *E-FILED 10-31-2011*

3

4

5

6

7                              NOT FOR CITATION

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                          SAN JOSE DIVISION

11  UNITED STATES *ex rel*. DONNA M.          No. C05-01962 HRL
    McLEAN and THE STATE OF CALIFORNIA
12  *ex rel* DONNA M. McLEAN,                 ORDER:

13                  Plaintiffs,               1.  GRANTING DEFENDANTS' MOTION
                                              FOR SUMMARY JUDGMENT;
        v.                                    2.  DENYING RELATOR'S CROSS-
14                                            MOTION FOR SUMMARY JUDGMENT;
    THE COUNTY OF SANTA CLARA, THE            3.  GRANTING DEFENDANTS'
15  DEPARTMENT OF FAMILY AND                  MOTIONS TO STRIKE; AND
    CHILDREN'S SERVICES OF SANTA CLARA        4.  DENYING RELATOR'S
16  COUNTY, KENNETH BORELLI,                  ALTERNATIVE MOTIONS FOR RELIEF
    LAWRENCE GALLEGOS, EPIFANIO ("J.R.")
17  REYNA, TANYA BEYERS, DR. DEE             [Re:  Docket Nos. 197, 324, 347, 350, 365,
    SCHAFFER, DR. TOMMIJEAN THOMAS,           371, 373, 374, 388]
18  DR. RICHARD PERILLO and DOES 1-100,

19                  Defendants.
    _____/
20

21                               BACKGROUND

22          Relator Donna McLean filed this *qui tam* action in 2005 pursuant to the federal False

23  Claims Act (31 U.S.C. § 3729, et seq.) and the California False Claims Act (Govt. Code §

24  12651, et seq.).  In essence, the complaint alleged that defendants defrauded the federal and

25  state governments by (1) inventing fictional children in order to receive increased funding for

26  child welfare services; and (2) conspiring with local doctors to bill the federal and state

27  governments for services not rendered.

28          The instant action is not the first time that McLean has sued the County of Santa Clara

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    (County). Several years before she filed this suit, McLean (and several members of her family)

2    pursued three separate lawsuits against the County and some of its employees (a couple of

3    whom are also named defendants in the instant action). Two of those prior lawsuits were filed

4    in this court; the other action reportedly was filed in Santa Clara County Superior Court.

5    Briefly stated, those earlier lawsuits alleged, among other things, violation of constitutional

6    rights and fraud in connection with the removal of McLean's children from her home in 2001

7    and events which occurred during their juvenile dependency proceedings. In 2004, the parties

8    executed a settlement agreement ("2004 Settlement Agreement") in which they agreed to

9    resolve those three lawsuits. As part of that agreement, McLean agreed to release the County

10   defendants from liability for all existing and future claims arising from the subject matter of the

11   settlement.

12       Then, as noted above, McLean filed the instant *qui tam* suit the following year. After

13   their investigation into the allegations, the United States and the State of California declined to

14   intervene in this action. The court subsequently lifted the seal on the complaint and ordered

15   that it be served. Several defendants, including the County, answered the complaint. The

16   County also filed several counterclaims against McLean, essentially contending that the filing

17   of the instant *qui tam* action was a breach of the 2004 Settlement Agreement. The County's

18   counterclaims eventually were dismissed because, in sum, the instant action was brought by

19   McLean on behalf of the government, and McLean presented evidence suggesting that the

20   government was not aware of her allegations prior to the execution of the 2004 Settlement

21   Agreement. (Dkt. No. 153).

22       In the six years since the instant action was filed, this litigation has proceeded in fits and

23   starts. The court's original scheduling order contemplated, among other things, a May 18, 2007

24   close of fact discovery and an October 2007 trial. Shortly before the close of fact discovery,

25   however, McLean advised that she had a falling out with her first attorney, Douglas Linde.

26   Linde was, at McLean's request, permitted to withdraw as counsel of record. The court's

27   scheduling order was vacated, and the litigation was stayed for several months to allow McLean

28

United States District Court

For the Northern District of California

1  time to secure new counsel.  This was the first of several changes of relator's counsel that

2  would occur over the next few years.

3      Attorney Michael Millen eventually substituted into the case in September 2007 as

4  McLean's counsel of record.  Indeed, it was around this time that the Ninth Circuit made it clear

5  that *qui tam* claims cannot be maintained by relators on a pro se basis.  See United States ex rel

6  Stoner v. Santa Clara County Office of Education, 502 F.3d 1116, 1126-27 (9th Cir. 2007)

7  ("Because qui tam relators are not prosecuting only their 'own case' but also representing the

8  United States and binding it to any adverse judgment the relators may obtain, we cannot

9  interpret [28 U.S.C.] § 1654 as authorizing qui tam relators to proceed pro se in [False Claims

10  Act] actions.").

11      Soon after, this court held a case management conference and issued another scheduling

12  order, re-setting several deadlines, including a March 14, 2008 close of fact discovery and a

13  September 2, 2008 start of trial.  At that time, Millen advised that relator planned to file an

14  amendment to the original complaint, noting that the anticipated amendment would simply

15  refine some of the allegations contained in the original pleading.  Within months after Millen

16  substituted into the case, however, McLean advised that her attorney-client relationship with

17  him had also irreparably broken down.  Relator herself signed and filed the Amendment to

18  Complaint on February 8, 2008.  And, a few days later, McLean filed a request to allow Millen

19  to withdraw as her counsel of record.  That motion was granted, and McLean's third attorney,

20  William Dresser, substituted into the case.

21      Compared to his predecessors, Dresser had the longest involvement in this litigation.

22  Nevertheless, when he, too, eventually moved (with McLean's consent) for permission to

23  withdraw in September 2009, this court was told for the first time that (1) he had begun to have

24  disagreements with McLean as early as May 2008; (2) he and McLean had essentially stopped

25  speaking to one another in September 2008; and (3) McLean had been actively seeking new

26  counsel for over a year.  (See Dkt. No. 277).  Dresser's motion to withdraw was conditionally

27  granted, subject to the requirement that papers could continue to be served on him unless and

28  until McLean appeared in the action through other counsel.  Noting McLean's almost annual

changes in counsel, and the fact that she had been looking for over a year for an attorney to replace Dresser, the court granted one more brief extension of the case to allow McLean to find a new attorney.  The court also noted that, if McLean failed to secure new counsel by the expiration of the stay, then the case would be dismissed, without prejudice to the government.  (See id.).

Just prior to the expiration of the stay, McLean requested yet another extension of time to retain a new attorney.  Although this court found no good cause for the extension, it granted McLean one final extension to secure new counsel.  Her current counsel then substituted into the case.  The court held another case management conference and re-set the filing deadline for dispositive motions.[1]

Meanwhile, the claims brought on behalf of the State of California were voluntarily dismissed without prejudice.  Individual defendants Dr. Tommijean Thomas and Dr. Richard Perillo were also voluntarily dismissed; and, default was entered against Dr. Dee Shafer, and the claims against her were severed and stayed.  After conducting an investigation into the allegations of McLean's Amendment to Complaint, the United States declined to intervene.

McLean has had ample opportunity to conduct discovery.  Indeed, she has obtained thousands of pages of records not only through the formal discovery process in this litigation, but also through Freedom of Information Act requests, California Public Records Act requests, and petitions for disclosure filed with the state juvenile court.  Throughout discovery, relator served on defendants numerous discovery requests—some of which this court found to be vague, duplicative, or so overbroad as to be unreasonable—without attempting to show how the likely benefit of the discovery outweighed the burden and expense imposed.  Relator often failed to clearly explain what the requested information was or why she believed it was important to her claims.  Nevertheless, the court strove to parse through each of her requests and to give relator reasonable access to information she wanted without imposing undue burden

---

[1]     Defendants' summary judgment motion originally was filed in 2008. However, in view of myriad discovery motions filed at that time, defendants' motion was administratively terminated, without prejudice to re-notice the motion later.  (See Dkt. No. 263).

United States District Court

For the Northern District of California

or expense on defendants.  Defendants say that they responded to relator's requests for admission; answered three sets of interrogatories; and produced thousands of pages of documents in response to McLean's three sets of requests for production and six California Public Records Act requests, including:

- procedures manual re the County's submission of claims for reimbursement for child-welfare services;

- memoranda of understanding between the County and the labor organization that represents social workers;

- documents pertaining to funds paid to therapists that provided treatment to relator's family when her children were dependents of the juvenile court;

- documents pertaining to the number of children counted in relator's children's dependency case;

- documents pertaining to federal funds used to pay for foster care services, including Summary Reports of Assistance Expenditures for Emergency Assistance (EA) Foster Care–Federal;

- documents relating to the County's billing for funding requests for dependent children from January 1, 2001, through the date of production; payments to child-welfare services providers Tommijean Thomas and Dee Shafer; and all social worker case notes pertaining to McLean's children;

- documents pertaining to the Children's Shelter, including the license for the Children's Shelter issued by the California Department of Social Services; copies of reports and recommendations relating to an audit of the Children's Shelter; documents containing monthly bed counts at the Children's Shelter; a copy of the Children's Shelter Handbook; records of payments by the State of California to the County of Santa Clara on various programs listed in Relator's requests; contracts and licenses pertaining to the Children's Shelter; contracts between the County and Starlight Adolescent Center; contracts between the County and Eastfield Ming Quong; contracts between the County and the Unity Care Group; and contracts between the County and Charter Behavioral Health System; and

- adjusted County Expense Claims ("CECs").

Defendants further note that McLean deposed a number of County employees, including:

- Social Services Agency (SSA) Director William Lightbourne;

- former Deputy Director of the Department of Family and Children's Services (DFCS) and defendant Kenneth Borelli;

- Social work supervisor and defendant Lawrence Gallego;

- Social worker and defendant Tanya Byers;

- former Director of Fiscal and Administrative Services for SSA Onita Spake;

**United States District Court**
For the Northern District of California

1        •        DFCS Director Norma Sparks;

2        •        DFCS Program Manager Lori Medina; and

3        •        former Director of Fiscal and Administrative Services for SSA Christian Griffith,
                  who was deposed twice—once as a Fed. R. Civ. P. 30(b)(6) witness in February
4                 2008 and again as a non-retained expert in June 2008.

5    (See Dkt. No. 271).  The court nevertheless granted McLean's request to obtain some additional

6    document and deposition discovery.  (Id.).

7         The facts underlying relator's various theories of liability have also changed over the

8    years.  As discussed above, the gist of the original complaint was that defendants (1) created

9    fictional children to obtain increased government funding for welfare services and (2) conspired

10   with local physicians to fraudulently bill the government for services that were never rendered.

11   The gist of McLean's Amendment to Complaint is that the County fraudulently bills the federal

12   and state governments for costs in connection with the County's Children's Shelter.[2]  And, as

13   stated in her pending summary judgment motion, McLean now contends that the County has

14   falsely inflated eligibility ratios used to claim federal funds for reimbursement of foster care

15   administrative costs.

16        At present, the only remaining claims are those brought under the federal False Claims

17   Act (FCA or Act) on behalf of the United States.  The remaining defendants are the County; the

18   County Department of Family and Children's Services (DFCS); Tanya Byers (a DFCS social

19   worker who was assigned to McLean's child dependency case); Kenneth Borelli (Byer's

20   Program Manager); Lawrence Gallegos (Byers' Supervisor); and Epifanio Reyna (a DFCS

21   employee).

22        Now before the court are the parties' cross-motions for summary judgment.[3]  At their

23   request, the court gave the parties several months to complete the briefing on their respective

24   motions.  Defendants have also filed several motions to strike.  And, relator has filed several

25   _____

26        [2]    The parties advise that the Children's Shelter closed in 2010.  There is no
     indication that the closure had anything to do with the allegations in this lawsuit.

27        [3]    Defendants were given an opportunity to either proceed with their previously
     filed summary judgment motion or to file a renewed motion that supplemented or modified
28   their original one.  (See Dkt. No. 290).  They chose to proceed with their previously filed
     motion.

United States District Court

For the Northern District of California

1    alternative motions for relief.  The moving parties have expressly consented that all proceedings

2    in this matter may be heard and finally adjudicated by the undersigned.  28 U.S.C. § 636(c);

3    FED. R. CIV. P. 73.  With one limited exception as to the standard for liability under the FCA

4    (discussed below), the United States has not opposed or joined in the pending motions, and it

5    chose not to attend oral argument.  (See Dkt. No. 311).

6        Upon consideration of the moving and responding papers,[4] as well as the arguments of

7    counsel, the court grants defendants' motions to strike;[5] grants defendants' motion for summary

8    judgment; denies relator's cross-motion for summary judgment; and denies relator's alternative

9    motions for relief.

10                                    LEGAL STANDARD

11       A motion for summary judgment should be granted if there is no genuine issue of

12   material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P.

13   56(a), (c)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The moving party

14   bears the initial burden of informing the court of the basis for the motion, and identifying

15   portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits

16   which demonstrate the absence of a triable issue of material fact.  Celotex Corp. v. Catrett, 477

17   U.S. 317, 323 (1986).  In order to meet its burden, "the moving party must either produce

18   evidence negating an essential element of the nonmoving party's claim or defense or show that

19   the nonmoving party does not have enough evidence of an essential element to carry its ultimate

20   burden of persuasion at trial."  Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.,

21   210 F.3d 1099, 1102 (9th Cir. 2000).

22       If the moving party meets its initial burden, the burden shifts to the non-moving party to

23   produce evidence supporting its claims or defenses.  See Nissan Fire & Marine Ins. Co., Ltd.,

24

25       [4]        Defendants' requests for judicial notice are granted.

26       [5]        Defendants have asserted a number of evidentiary objections to relator's
     exhibits and declarations, including several documents which were not even mentioned or
     discussed by relator in her papers.  The court finds those objections to be well-taken.  And,
27   the court's rulings on those objections are discussed more fully below, or are summarized in
     the addendum to this order.  Even if the objectionable evidence were to be considered, for
28   the reasons to be discussed, this court finds no genuine issue of material fact that any fraud
     occurred.

United States District Court

For the Northern District of California

1   210 F.3d at 1102.  The non-moving party may not rest upon mere allegations or denials of the

2   adverse party's evidence, but instead must produce admissible evidence that shows there is a

3   genuine issue of material fact for trial.  See id.  A genuine issue of fact is one that could

4   reasonably be resolved in favor of either party.  A dispute is "material" only if it could affect the

5   outcome of the suit under the governing law.  Anderson, 477 U.S. at 248-49.

6        "When the nonmoving party has the burden of proof at trial, the moving party need only

7   point out 'that there is an absence of evidence to support the nonmoving party's case.'"

8   Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Celotex Corp., 477 U.S. at

9   325).  Once the moving party meets this burden, the nonmoving party may not rest upon mere

10   allegations or denials, but must present evidence sufficient to demonstrate that there is a

11   genuine issue for trial.  Id.

DISCUSSION

12   A.     Overview of Federal Funding for Foster Care

14        There are a number of statutes and regulations which provide the framework for the

15   claims for federal funds in question.  The court provides a brief overview here.  For present

16   purposes, there appears to be no material dispute as to the following facts:

17        The federal Foster Care Program is authorized by Title IV-E of the Social Security Act

18   (Title IV-E) and implemented under the Code of Federal Regulations, 45 C.F.R. §§ 1355-1357.

19   (See Dkt. No. 316, Relator's Request for Judicial Notice (RJN), Vol. I-A, Ex. 23 at 7; Dkt. No.

20   341, Defts' RJN ISO Opp. to Relator's MSJ, Ex. A).  Under Title IV-E, the federal government

21   shares 50% of state and local foster care costs for administrative expenditures necessary for the

22   proper and efficient administration of the state's Title IV-E plan.  45 C.F.R. § 1356.60(c).

23   California has developed a Title IV-E plan, which "consists of a compilation of California

24   statutes, regulations, All County Letters, All County Information Notices, County Fiscal

25   Letters, and other documents that are intended to implement federal requirements for the federal

26   foster care program in order to claim Federal Financial Participation in payments made under

27   the program."  California Alliance of Child and Family Services v. Allenby, 589 F.3d 1017,

28   1019 n.1 (9th Cir. 2009).  Administrative expenses eligible for Title IV-E funds include:

1  eligibility determination and re-determination; fair hearings and appeals; referral to services;

2  preparation for and participation in judicial determinations; child placement; development of

3  the case plan; case reviews; case management and supervision; recruitment and licensing of

4  foster homes and institutions; rate setting; a proportionate share of agency overhead; and costs

5  related to data collection and reporting.  45 C.F.R. § 1356.60(c)(1)-(2).  Allowable costs "do not

6  include the costs of social services provided to the child, the child's family or foster family

7  which provide counseling or treatment to ameliorate or remedy personal problems, behaviors or

8  home conditions."  Id., § 1356(c)(3).

9         In California, welfare programs are supervised by the state, but administered by

10  counties.  (Dkt. No. 199, Kiniyalocts Decl. ISO Defs' MSJ, Ex. Q, County Expense Claim

11  Manual at 1).  The state's Department of Social Services (CDSS) (1) issues to counties

12  regulations on the administration of welfare programs and (2) sets county standards for

13  obtaining federal and state reimbursement of costs incurred in administering mandated

14  programs.  (Id.).

15         The County Expense Claim (CEC) process is the means by which counties claim federal

16  funds for reimbursement of costs incurred in the administration of a number of welfare

17  programs, including child welfare.  Counties must prepare CECs in compliance with state

18  instructions and guidance contained in All County Information Notices, All County Letters,

19  County Fiscal Letters, and County Fiscal Information Notices.  (Dkt. No. 199, Kiniyalocts Decl.

20  ISO Defs' MSJ, Ex. H (Spake Depo. at 173:2-5, 176:20-177:4); Ex. Q at 1).  The CDSS then

21  determines which expenditures can be reimbursed with state or federal funds and which

22  expenses must be paid by county funds.  (Id.).

23  B.     Public Disclosure Bar

24         Defendants argue that the instant lawsuit is barred because the basis for McLean's

25  allegations were publicly disclosed prior to the filing of the instant action.

26         The FCA discourages opportunistic *qui tam* relators and "deprives a district court of

27  jurisdiction over any *qui tam* action that is based upon allegations or transactions already

28  disclosed in certain public fora, unless the relator is the original source of the information

United States District Court

For the Northern District of California

1    underlying the action." A-1 Ambulance Service, Inc. v. California, 202 F.3d 1238, 1243 (9th

2    Cir. 2000).  The Act provides, in relevant part, that an action or claim shall be dismissed "if

3    substantially the same allegations or transactions as alleged in the action or claim were publicly

4    disclosed" in one of three categories:  (1) "in a Federal criminal, civil, or administrative hearing

5    in which the Government or its agent is a party"; (2) "in a congressional, Government

6    Accountability Office, or other Federal report, hearing, audit, or investigation;" or (3) "from the

7    news media."  31 U.S.C. § 3730(e)(4)(A)(I)-(iii).

8         Defendants contend that the information underlying relator's claims have been publicly

9    disclosed in (1) two reports of an audit conducted by the Inspector General of the U.S.

10   Department of Health and Human Services; and (2) various internet materials and other publicly

11   available materials.  There is no apparent dispute that the materials in question fall within the

12   sources enumerated in the FCA.  See generally, e.g., Schindler Elevator Corp. v. United States,

13   131 S. Ct. 1885 (2011) (holding that written responses to Freedom of Information Act requests

14   are "reports" subject to the public disclosure bar).  However, the parties disagree whether those

15   materials disclose McLean's allegations of fraud.

16        On the record presented, defendants fail to convince that the public disclosure bar

17   applies.  The court agrees that the audit reports in question generally disclose aspects of

18   McLean's allegations.  (See Dkt. No. 199, Kiniyalocts Decl. ISO Defts' MSJ, Exs. R and S).  In

19   sum, the reports found that an issue was that a child's removal from the home was not supported

20   by a judicial determination that pre-removal reasonable efforts had been made to keep the child

21   at home.  But, while the reports indicate that the County was among those surveyed, they do not

22   attribute any particular conduct to the County.  Moreover, McLean points out that her

23   allegations post-date the audit period covered by the reports.  See, e.g., United States ex rel Bly-

24   Magee v. Premo, 470 F.3d 914, 920 (9th Cir. 2006) (holding that relator's claims that were

25   similar to, but post-dating claims alleged in her earlier qui tam lawsuit were not jurisdictionally

26   barred); see also United States ex rel Cooper v. Blue Cross and Blue Shield of Florida, Inc., 19

27   F.3d 562 (11th Cir. 1994) (concluding that Government Accountability Office reports were

28   insufficient to trigger the jurisdictional bar because, although the reports mentioned defendants

10

United States District Court

For the Northern District of California

1    and were critical of their practices, the reports alleged fraud based on the conduct of different

2    entities and different events than those at issue in the litigation).

3           Defendants nonetheless maintain that (1) all of the essential information anyone needs to

4    figure out whether the County has defrauded the federal government is already publicly known;

5    and (2) McLean simply analyzed the information and came up with a theory of fraud—which,

6    defendants say, is completely unsupported in any event.  McLean argues that the documents in

7    question do not actually reveal the fraud she (now) claims the County perpetrated—i.e., falsely

8    inflating eligibility ratios to get more federal funding.  Instead, she says that she had to glean

9    the information, analyze it, and put two and two together.  Defendants do not point to anything

10   in the public documents showing that both the alleged misstatements and the alleged true

11   statements were publicly disclosed.  See United States ex rel. Foundation Aiding the Elderly v.

12   Horizon West, Inc., 265 F.3d 1011, 1015 (9th Cir. 2001) (the jurisdictional bar applies where

13   both the truth and the allegedly fraudulent statements are disclosed in the sources enumerated in

14   the FCA).  Accordingly, on the record presented, the court concludes that there was no public

15   disclosure within the meaning of the FCA.  The court therefore need not decide whether

16   McLean is an "original source" of the information.

17          Even so, for the reasons stated below, the court also finds that McLean has not presented

18   evidence giving rise to a genuine issue of material fact that the County defrauded the

19   government of funds.

20   C.     Liability Under the FCA

21          The FCA imposes liability on anyone who, among other things, "knowingly presents, or

22   causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. §

23   3729(a)(1)(A).  The scope of a false or fraudulent claim is to be broadly construed:

24          [E]ach and every claim submitted under a contract, loan
             guarantee, or other agreement which was originally obtained by
25          means of false statements or other corrupt or fraudulent conduct,
             or in violation of any statute or applicable regulation, constitutes
26          a false claim.

27   United States ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1170-71 (9th Cir. 2006)

28   (quoting S. Rep. No. 99-345, at 9 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5274)).  The

elements of a claim for violation of the FCA are: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." Id. at 1174. Although McLean argues that it is defendants' burden to prove that their claims for federal funds are truthful, it is she who must prove all elements of an FCA claim by a preponderance of the evidence. 31 U.S.C. § 3731(d); United States ex rel Aflatooni v. Kitsap Physicians Services, 163 F.3d 516, 525 (9th Cir. 1999) ("The relator bears the burden of establishing jurisdiction, and all other essential elements of his claim, by a preponderance of the evidence.") (internal quotes and citations omitted).

As noted above, relator has, at different times in these proceedings, asserted several theories (with various alleged factual underpinnings) as to how defendants allegedly defrauded the government. Each one is discussed, in turn, below.

D.     Theory No. 1:  Defendants conspired with local doctors to bill the federal government for services not rendered.

McLean's original complaint alleged that defendants submitted false claims to the United States for services provided by Dr. Tommijean Thomas, Dr. Dee Shafer,[6] and Dr. Richard Perillo. (Dkt. No. 199, Kiniyalocts Decl. ISO Defts' MSJ, Ex. A, Complaint at ¶¶ 35-54). Drs. Thomas, Shafer, and Perillo were all involved in McLean's child dependency case.

Defendants now move for summary judgment on the ground that McLean has no evidence to substantiate her allegations. As noted above, Drs. Perillo and Thomas were voluntarily dismissed years ago. (See Dkt. Nos. 55, 118). Moreover, in deposition, McLean testified that she does not know (1) whether the County submitted a false claim for federal reimbursement of funds for Dr. Thomas' services; (2) the amount of the allegedly false claim; or (3) the sources of funding used to pay Dr. Thomas. (Dkt. No. 199, Kiniyalocts Decl. ISO Defts' MSJ, Ex. F (McLean Depo. at 76:17-86:3, 100:4-9)). And, the County has produced evidence indicating that Dr. Thomas was paid with county funds and that the County does not

---

[6]     Although the complaint identified Dr. Shafer as "Dr. Dee Schaeffer," it appears that her last name actually is spelled "Shafer." (Dkt. No. 200, Griffith Decl., Ex. X).

United States District Court

For the Northern District of California

1   receive any state or federal reimbursement for those expenditures.  (Dkt. No. 200, Griffith Decl.

2   ISO Defts' MSJ, ¶¶ 3, 5, Exs. T & U).  Similarly, the County has submitted evidence indicating

3   that Dr. Perillo, too, was paid with county funds for his work in McLean's child dependency

4   case.  (Dkt. No. 200, Griffith Decl. ISO Defts' MSJ, ¶¶ 4, 5, Exs. V & W).

5         As for Dr. Shafer, McLean testified in deposition that she believes that Shafer was paid

6   for counseling sessions with McLean's ex-husband which never took place, or that Shafer was

7   paid for more counseling sessions than were actually provided.  (Dkt. No. 199, Kiniyalocts

8   Decl. ISO Defts' MSJ, Ex. F (McLean Depo. at 88:16-89:6).  However, relator also testified

9   that she does not know how many counseling sessions her ex-husband attended.  (Id. at 89:23-

10  90:12)).  She further testified that she did not know whether Dr. Shafer's services were actually

11  included in any CEC claim form for reimbursement.  (Id. at 100:4-9)).  The County has

12  presented evidence indicating that Dr. Shafer was not paid for her services with any federal

13  funds.  (Dkt. No. 200, Griffith Decl., ¶ 6, Ex. X at SC00406-407, 414, 415, 420, 424, 429).

14        McLean has presented no evidence giving rise to a material fact issue here.  Indeed, she

15  did not address this issue in her opposition to defendants' motion and has seemingly abandoned

16  this particular theory of liability.  Accordingly, as to this issue, defendants' summary judgment

17  motion is granted.

18
19  E.   Theory No. 2:   Defendants created fictional children in order to increase federal funding
        received for child welfare services.

20        McLean's original complaint also alleged that defendants made up fictional children in

21  order to falsely inflate federal funding received for child welfare services.  The apparent

22  linchpins of this theory are two notes written by defendant Tanya Byers, the social worker

23  assigned to McLean's child dependency case.  Those notes, state, in relevant part that

24  "[McLean's] case count will be for (5) children even though there are only (2) children as per

25  Ken due to the complexity of this case" and "[McLean] has 2 kids but agency will get case

26  count for (5) children as per Ken B."  (Dkt. No. 339, Renneisen Decl., Exs. 92, 93).  McLean

27  also claims that documents produced by the County show that the County overstated the

28  number of people in McLean's family as "12."  She has submitted what appear to be printouts

United States District Court

For the Northern District of California

1   from a DFCS database in which her children are identified as "Person #11" and "Person #12"

2   and in which McLean's name appears next to the number "51." (Id., Exs. 95, 97).

3       In deposition, Byers testified that when she received McLean's child dependency case,

4   Byers had a conversation with defendant Lawrence Gallegos (her supervisor) and defendant

5   Kenneth Borelli (the program manager for Byer's unit). (Dkt. No. 199, Kiniyalocts Decl. ISO

6   Defts' MSJ, Ex. J (Byers Depo. at 22:8-26:8)). Byers explained that McLean's child

7   dependency case was considered complex, and Byers was told that with respect to her caseload,

8   handling McLean's case would be more like handling a family with five children, even though

9   McLean had only two. (Id. at 22:10-13)). With respect to the notes in question, Byers testified

10  that she wrote those notes as a reminder to herself for purposes of managing her

11  workload[7]—that is, if her supervisor assigned her more cases in the future, Byers would remind

12  him that McLean's case was considered complex. (Id. at 23:23- 24:12; 27:7-22). According to

13  Byers' testimony, neither Gallegos or Borelli suggested to her that she would be able to count

14  extra children in her caseload. (Id. at 30:22-35:24). And, Byers stated that her caseload count

15  for McLean's child dependency case was for two children only. (Id. at 34:5-13).

16      Additionally, Lori Medina, a Social Services Program Manager who was identified by

17  the County as the person most knowledgeable about caseload standards, confirmed that the

18  statewide computer child welfare case management system showed that Byers' case count for

19  McLean's case was for two children. (Id., Ex. K (Medina Depo. at 73:11-21; 83:13-19)).

20  Moreover, Christian Griffith, then the Director of Fiscal and Administrative Services at the

21  County's Social Services Agency, testified that Byers's notation in her case notes that Relator's

22  children's dependency case would count as five children instead of two was not used for any

23  accounting or reimbursement purposes. (Id., Ex. G (Griffith Depo. at 40:18-41:13)). Griffith

24  also testified that the County regularly exceeds the amount of money available for

25

26          [7]    Byers testified that there was a labor agreement between the County and the
    union that represented social workers that set caseload standards. (Dkt. No. 199, Kiniyalocts
27  Decl. ISO Defts' MSJ, Ex. J (Byers Depo. at 11:21-12:3)). The caseload standards referred
    to the number of children social workers could be assigned. (Id. at 16:20-17:11.) Although
28  Byers's caseload standard at the time she received relator's children's case was 34, she
    testified that sometimes she had more children and sometimes less. (Id. at 17:2-13).

14

United States District Court

For the Northern District of California

1    reimbursement from state and federal sources and that "there is no incentive for the County to

2    incur more costs" because "it doesn't draw additional revenue." (Id. at 35:12-13).

3        McLean argues that the County's submitted testimony should be disregarded as merely

4    self-serving.  "Only in certain instances—such as when a declaration 'state[s] only conclusions,

5    and not 'such facts as would be admissible in evidence,'—can a court disregard a self-serving

6    declaration for purposes of summary judgment." Securities & Exchange Comm'n v. Phan, 500

7    F.3d 895, 909 (9th Cir. 2007) (quoting Fed. R. Civ. P. 56(e)).  Here, each of these witnesses'

8    testimony concerns matters within their own personal knowledge, and the court finds no basis to

9    disregard their statements as self-serving.

10       On the record presented, the court finds that McLean has not presented evidence

11   sufficient to raise a genuine issue of material fact as to whether defendants create fictional

12   children for the purpose of overbilling the federal government.  Accordingly, defendants'

13   summary judgment motion as to this issue is granted.

14

15   F.    Theory No. 3:   Defendants submitted false claims for children who were not physically
            present at the County Children's Shelter.[8]

16

17       As alleged in her Amendment to Complaint, relator claims that the County falsely

18   obtained federal funds for children who were not actually present at the County Children's

19   Shelter, "including but not limited to children that were part of a prostitution ring and had not

20   been at the shelter in months." (Dkt. No. 199, Kinyalocts Decl. ISO Defs' MSJ, Ex. C ¶

21   54.10).  McLean further alleges that the County reaped duplicate reimbursement for shelter

22   costs from both the government and from the parents of children who are placed at the shelter.

23   Here, relator says that with respect to her own children's stay at the shelter, the County sent her

24   a bill for $5,000.  (Id. ¶ 54.07).  Additionally, relator alleges that although her children were at

25   the shelter for only five days, the County continued to report her children as being in the shelter

26   for a year for the purpose of obtaining federal funds.  (Id. ¶ 54.08).

27   ───────────────────

28       [8]      The court distinguishes this theory of liability from McLean's contention that
     the County falsely claimed federal funds for children who allegedly should not have been at
     the Children's Shelter in the first place.  This latter allegation is addressed below.

United States District Court

For the Northern District of California

1    It is undisputed that the facility in question was an emergency shelter.  Federal funding

2    is available for emergency services, not through the foster care program, but under the

3    Temporary Assistance to Needy Families (TANF)—a block grant intended to provide short-

4    term assistance to children and families in emergency situations who meet certain criteria.

5    (Dkt. No. 356, Defts' RJN, Ex. T).  For example, federal eligibility is based on (among other

6    things) the child having had only one emergency episode in a 12-month period.  (Id., Exs. T and

7    DD).  If a family received emergency assistance during the previous twelve months, the next

8    eligibility period would begin 12 months after the beginning date of the previous period.  (Id.,

9    Ex. T).  And, unlike requirements for Title IV-E foster care funds, defendants say that eligibility

10    rules for federal funding under TANF do not require a prior court determination of reasonable

11    efforts before removal of a child from his home.  (Id.).  McLean has not cited authority

12    suggesting the contrary.

13    There is no evidence corroborating the allegation that defendants falsely counted among

14    the shelter's residents children that were part of a prostitution ring and had not been at the

15    shelter in months, much less that the County applied or received federal reimbursement for

16    them.

17    With respect to her own children, relator has submitted a document obtained during her

18    prior legal actions against the County and which, she says, establishes that defendants recorded

19    her children as being at the Children's Shelter for a year.  (See Dkt. No. 339, Renneisen Decl.,

20    Ex. 97).  The document appears to be a printout from a database entry pertaining to McLean and

21    the Children's Shelter, with the following notations:  "APPLICATION 100 01/20/01"; "POS

22    ACTION 100 01/20/01"; and "NEG ACTION 99 01/24/02."  (Id.).  It is not clear exactly what

23    this document is, and McLean does not explain.  On the record presented, it is far from clear

24    that these entries signify what McLean says they do.  Nor does McLean provide any foundation

25    for her assertion as to what the entries mean.  More to the point, there is no evidence showing

26    that defendants falsely claimed federal funds in connection with her children's stay at the

27    shelter.

28

United States District Court

For the Northern District of California

1    As for McLean's claim that she was billed $5,000 for her children's stay at the shelter,

2    she testified in deposition that she no longer has possession of the bill; she was not required to

3    pay it; she did not pay it; and she does not know what happened with the bill, or whether it was

4    paid at all.  (Dkt. No. 199, Kiniyalocts Decl. Ex. F (McLean Depo. at 22:6-25:17)).

5    McLean points out that the shelter also included a number of non-emergency services,

6    i.e., a health clinic, training and education programs, camps for children, art programs, and

7    other non-emergency activities.  As such, she theorizes that the County improperly claimed

8    federal reimbursement for those programs and services.  There is no evidence substantiating

9    that hypothesis, however.  And, the County's Chief Financial Officer, Sandra Dalida, attests

10   that these educational and other programs (e.g., the Art Education Program Grant, Assessment,

11   Clover House, Social Worker Training Specialist, Success Camp, and Visitation programs)

12   were not claimed under Emergency Assistance-Emergency Shelter Care costs.  (Dkt. No. 353,

13   Dalida Decl. ¶ 2).

14   There is no apparent dispute that, for claiming purposes, at least some portion of the

15   County's operating costs for the shelter are allocated among various funding sources based on a

16   number of factors, including the number of days that a child has been in emergency shelter care.

17   (Dkt. No. 356, Defts' RJN, Ex. DD at 7; Dkt. No. 353 Dalida Decl. ¶¶ 3-4; Dkt. No. 199,

18   Kiniyalocts Decl., Ex. G (Griffith Depo. at 34:16-35:13, 49:13-51:22, 79:3-25, 83:5-8)).

19   McLean contends that the County must have falsely claimed reimbursement for shelter costs

20   under TANF.  She relies on the declarations of Joseph F. Loftus (offered here for his opinions

21   as a purported expert in child welfare fiscal policies and practices) and Nedra Jones (a former

22   County Ombudsperson).  In essence, both opine that the County has overstated the number of

23   children who stay at the shelter.  Defendants move to strike both declarations in their entirety.

24   Defendants' motion to strike the Loftus declarations is granted.[9]  In sum, Loftus was not

25   timely or properly disclosed as an expert.  Although relator argues that Loftus' opinions are

26   appropriately offered in rebuttal to expert testimony defendants relied on in their moving

27

28         [9]    Relator's motion for leave to designate additional experts, including Loftus, is addressed below.

United States District Court

For the Northern District of California

1   papers, defendants submitted no expert testimony in support of their motion.  Rather, they

2   presented only testimony given by County employees in their capacities as percipient witnesses.

3          As for Nedra Jones, her declaration indicates that she served as County Ombudsperson

4   from 2001 to 2003 and, in that capacity, dealt with complaints concerning the Children's

5   Shelter.  Defendants' motion to strike the testimony at ¶¶ 10-13 of Jones' declaration is granted.

6   Even if that testimony is credited, however, it does not raise a triable issue as to the County's

7   alleged fraudulent billings for federal funds.  Jones states that the County routinely listed

8   runaways and "paper admits" (i.e., children who were actually staying elsewhere, usually with

9   relatives) as being among the shelter's residents.  She identifies only two instances where this

10  reportedly happened, the details of which are murky.  Jones does not say that she has any

11  knowledge or experience in the methods used by the County in claiming federal funds.  Nor is it

12  apparent that Jones has any knowledge of the numbers of children the County reported as part

13  of its claims for federal funding.  The court finds that Jones' testimony does not materially

14  advance relator's theory that the County actually falsely claimed or received TANF funds for

15  children who were not at the shelter.

16         McLean has not presented evidence giving rise to a triable issue as to her claim that

17  defendants falsely billed the government for children who were not physically at the shelter.

18  Defendants' summary judgment motion on this issue is granted.

19

20  G.     Theory No. 4:   Defendants falsely inflated federal eligibility ratios for reimbursement of
           foster care administrative costs.

21

22         According to relator's Amendment to Complaint, defendants submitted false claims for

23  federal funds with respect to children who were physically present at the shelter.  However, as

24  now reformulated in her summary judgment motion, McLean posits that the County falsely

25  inflated the eligibility ratio—i.e., the Title IV-E/Non-Title IV-E Discount Rate (Discount

26  Rate)—underlying its claims for federal reimbursement of foster care administrative costs.  This

27  portion of McLean's theory of liability stems from federal regulations which essentially provide

28  that in order for a child to be eligible for federal funding, there must be a judicial determination

United States District Court
For the Northern District of California

1   that, prior to the child's removal from the home and placement into foster care, "reasonable

2   efforts" were made to preserve family unity.  42 U.S.C. § 671(a)(15); 45 C.F.R. § 1356.21.  In

3   sum, McLean claims that defendants unnecessarily remove children from their homes in order

4   to claim increased federal reimbursement of foster care administrative costs.

5          Before addressing McLean's arguments, the court first provides a brief recap of the

6   County's Title IV-E claiming process.

7          As discussed above, the federal Foster Care Program is authorized by Title IV-E of the

8   Social Security Act (Title IV-E) and implemented under the Code of Federal Regulations, 45

9   C.F.R. §§ 1355-1357.  States are required to have a Title IV-E plan that meets certain

10  requirements.  And, federal funds for state and local foster care costs are available at a rate of

11  50% for administrative expenditures necessary for the proper and efficient administration of the

12  state's Title IV-E plan.  45 C.F.R. § 1356.60(c).

13         California has developed a Title IV-E plan, which "consists of a compilation of

14  California statutes, regulations, All County Letters, All County Information Notices, County

15  Fiscal Letters, and other documents that are intended to implement federal requirements for the

16  federal foster care program in order to claim Federal Financial Participation in payments made

17  under the program."  California Alliance of Child and Family Services, 589 F.3d at 1019 n.1.

18  Administrative expenses eligible for Title IV-E funds include:   eligibility determination and re-

19  determination; fair hearings and appeals; referral to services; preparation for and participation in

20  judicial determinations; child placement; development of the case plan; case reviews; case

21  management and supervision; recruitment and licensing of foster homes and institutions; rate

22  setting; a proportionate share of agency overhead; and costs related to data collection and

23  reporting.  45 C.F.R. § 1356.60(c)(1)-(2).  Allowable costs "do not include the costs of social

24  services provided to the child, the child's family or foster family which provide counseling or

25  treatment to ameliorate or remedy personal problems, behaviors or home conditions."  Id., §

26  1356(c)(3).

27         California's welfare programs are supervised by the state, but administered by counties.

28  (Dkt. No. 199, Kiniyalocts Decl. ISO Defts' MSJ, Ex. Q, County Expense Claim Manual at 1).

1   The state's Department of Social Services (CDSS) (1) issues to counties regulations on the

2   administration of welfare programs and (2) sets county standards for obtaining federal and state

3   reimbursement of costs incurred in administering mandated programs.  (Id.).

4          States report, on a quarterly basis, the costs of administering their foster care programs.

5   (Dkt. No. 316, Relator's RJN Vol. I-A, Ex. 23 at 9).  States also generate a Discount Rate

6   (sometimes referred to as a penetration rate), i.e., an eligibility statistic that represents the

7   proportion of Title IV-E eligible children who have been placed in foster care (numerator)

8   relative to all children served by the state's foster care program (denominator).  (Id.).  As noted

9   above, federal funds for state and local foster care costs are available at a rate of  50% for

10  administrative expenditures necessary for the proper and efficient administration of the state's

11  Title IV-E plan.  45 C.F.R. § 1356.60(c).  Thus, as explained by the County, if (hypothetically)

12  administrative costs of providing foster care services amount to $100 and there are 80 federally

13  eligible cases out of a total of 100 cases, the federal government will reimburse the County $40

14  (i.e., 50% of $80).

15         According to the County, the Discount Rate calculation is intended to distribute social

16  worker administrative hours that are eligible for Title IV-E funding without having to keep

17  track of time spent on each individual case, which could be difficult, costly and may lead to

18  inaccuracies.  (See Dkt. No. 344, Spake Decl. in Opp. to Relator's MSJ ¶ 3).  Thus, using the

19  Discount Rate, social worker hours associated with administrative costs are apportioned so that

20  only a percentage of administrative costs are attributed to the Title IV-E source of funds.  (Id.).

21         As discussed above, the County Expense Claim (CEC) process is the means by which

22  counties claim federal funds for reimbursement of costs incurred in the administration of a

23  number of welfare programs, including child welfare.  Counties must prepare CECs in

24  compliance with state instructions and guidance contained in All County Information Notices,

25  All County Letters, County Fiscal Letters, and County Fiscal Information Notices.  (Dkt. No.

26  199, Kiniyalocts Decl. ISO Defts' MSJ, Ex. H (Spake Depo. at 173:2-5, 176:20-177:4); Ex. Q

27  at 1).  The County submits CECs to the state on a quarterly basis.  The state then determines

28

United States District Court

For the Northern District of California

1  which expenditures can be reimbursed with state or federal funds and which expenses must be

2  paid by county funds.  (Id.).

3      Counties also submit monthly reports to the state, known as CA 800 FC reports, for

4  reimbursement from state and federal funds for a variety of welfare programs administered by

5  counties.  These CA 800 FC reports, which consist of federal (CA 800 FC Fed) and non-federal

6  (CA 800 FC NonFed) reports, include case counts.  (See Dkt. No. 344, Spake Decl. in Opp. to

7  Relator's MSJ ¶¶ 4, 5).

8      McLean contends that analysis of the County's claims forms, as well as other reports,

9  studies, and information, demonstrates that the County unnecessarily removes children from

10  their homes and falsely inflates the number of children who are eligible for federal funding.

11  McLean argues that, in this way, defendants falsely inflate the Discount Rate underlying the

12  County's claims for federal reimbursement; falsely certify that claimed costs actually were

13  incurred in compliance with applicable laws and regulations;[10] and knowingly receive Title IV-

14  E funds for unallowable costs.

15      Preliminarily, defendants contend that this theory of liability has been impermissibly

16  raised for the first time on summary judgment.  The Amendment to Complaint generally alleges

17  that defendants falsely claimed federal reimbursement for children who were not eligible for

18  federal funds (i.e., those whom relator claims did not belong at the shelter).  But nowhere in the

19  original complaint or the subsequent amendment is there an allegation that defendants

20  perpetrated a fraud on the government by falsely inflating the Discount Rate.  At the summary

21  judgment stage, liberal pleading standards are inapplicable, and new claims cannot properly be

22  raised for the first time on summary judgment.  See Tucker v. Union of Needletrades, Industrial

23

24      [10]      Defendants suggest that even if there were evidence that they failed to comply
with a particular statute or regulation, there can be no liability under the FCA if defendants

25  did not certify their compliance with that regulation.  As the United States points out,
however, such certification is not a prerequisite for liability.  See Hendow, 461 F.3d at 1170-

26  71 ("[E]ach and every claim submitted under a contract, loan guarantee, or other agreement
which was originally obtained by means of false statements or other corrupt or fraudulent

27  conduct, or in violation of any statute or applicable regulation, constitutes a false claim.")
(quoting S. Rep. No. 99-345, at 9 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5274)).  In

28  any event, for the reasons to be discussed, the court does not find a triable issue that any
fraud occurred here.

United States District Court

For the Northern District of California

and Textile Employees, 407 F.3d 784, 787 (6th Cir. 2005) (quoting Gilmour v. Gates,

McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004)).  Indeed, the first (vague) hint that

relator might be pursuing this particular theory came well after the close of discovery and at a

time when the parties were preparing to brief the instant summary judgment motions.  (See Dkt.

No. 307).  The specific factual allegations concerning the purported false inflation of the

County's Discount Rate were only fleshed out fully for the first time in relator's summary

judgment motion and in her opposition to defendants' summary judgment motion.  See Pickern

v. Pier 1 Imports (U.S.), Inc., 457 F.3d 963, 968-69 (9th Cir. 2006) (concluding that the district

court did not err in finding that plaintiff failed to provide adequate notice of her claims where

the specific factual grounds for those claims were presented for the first time on summary

judgment).

McLean nonetheless argues that the County's federal eligibility determinations

underpinning claims for federal funds have always been the focus of this litigation and have

been at issue throughout these proceedings.  In very broad-brush terms, that may be true; but,

relator's specific factual allegations as to the exact nature of the fraudulent activity have been a

moving target.  In any event, having reviewed the record, and as explained below, the court

finds that McLean has not presented competent evidence giving rise to a genuine issue of

material fact that defendants submitted false claims for federal funding by inflating federal

eligibility ratios.

       1.    Frost Declarations

The heart of McLean's analysis is presented through one of her attorneys, Kenneth A.

Frost.  In sum, Frost's declarations describe his efforts in reviewing, summarizing, and

analyzing a considerable amount of data from various sources, including (1) the County's CEC

forms; (2) a June 2006 General Accounting Office (GAO) report; (3) a February 1, 2007 CRS

Report for Congress; (4) CA 800 FC FED forms produced by defendants; (5) CA 800 FC

NONFED forms produced by defendants; (6) the County's monthly statistical summary for the

Children's Shelter; and (7) data sets from the County's Child Welfare Services/Case

Management System (CWS/CMS) database.

United States District Court
For the Northern District of California

Frost is not an expert on statistical analysis.  Nor does he purport to be one.  On that basis, defendants move to strike his declarations, as well as the various graphs and charts he created.  McLean contends that Frost merely summarized evidence and that no particular expertise is required to do that.  She further argues that defendants' arguments as to Frost's lack of expertise go to the weight of his declaration, not its admissibility.  However, the analysis Frost provides appears, in places, to be more than simple summarization.  It seems that he prepared charts and graphs of different data from different sources that had been gathered for different purposes.  He compared the data, without establishing a foundation that the information was comparable.  He provided no justification for the methodologies he used.  He performed an analysis and drew conclusions based on his analysis.  That is expert work, and Frost is no expert.  Accordingly, defendants' motion to strike Frost's declarations and various exhibits is granted.  FED. R. EVID. 702, 703; FED. R. CIV. P. 26(a), 37(c)(1).

Because Frost's analysis seems to be the current centerpiece of relator's latest theory of liability, the court has considered it anyway.  But, for the reasons stated below, the court nonetheless concludes that McLean fails to raise a genuine issue of material fact as to liability under the FCA.

### 2.   Calculation of the County's Discount Rate

The crux of McLean's false inflation theory is her belief that the County has consistently inflated its Discount Rate used for claiming federal reimbursement of foster care administrative costs.  In sum, McLean says that, according to the County's CEC Manual, the County is required to calculate the Discount Rate based on information contained in the CA 800 FC forms.  Relying on Frost's analysis, relator contends that the County's Discount Rate is false because (1) the County's Discount Rate far exceeds the national or state average and (2) the County allegedly underclaims the nonfederal persons reported in those forms, which in turn, falsely inflates the Discount Rate used to claim federal reimbursement of foster care administrative costs.

23

United States District Court
For the Northern District of California

a.    Adjustments in Calculation of the Discount Rate

Defendants maintain that Frost's statistical analysis is fatally flawed because it is based on erroneous assumptions about how the Discount Rate actually is calculated.  They contend (and McLean does not deny) that Frost simply extracted federal and nonfederal case counts from the CA 800 FC forms and computed what McLean claims is the true Discount Rate, without accounting for requisite adjustments (e.g., for legal guardianship cases, among others) that must be made in accordance with relevant County Fiscal Letters.  (See, e.g., Dkt. No. 344, Spake Decl. in Opp. to Relator's MSJ, ¶ 5; Dkt. No. 341, Defts' RJN in Opp. to Relator's MSJ, Ex. B; Dkt. No. 341, Defts' RJN in Opp. to Relator's MSJ, Ex. C at 2-4).  McLean responds that legal guardian cases are minuscule compared to the total foster care population and cannot account for the discrepancy between the County reported Discount Rate and what she believes to be the true Discount Rate.  But, the record presented indicates that in calculating the alleged "true" County Discount Rate, Frost simply totaled monthly federal and nonfederal case counts from the County's CA FC 800 form without accounting for the requisite adjustments.  McLean says that she followed guidelines in the County's own CEC Manual in formulating her analysis. However, Ranjan Bagla, a County employee who was involved in the development of the CEC Manual, attests that the manual was not intended to be a comprehensive set of legal requirements concerning the calculation of the Discount Rate.  (Dkt. No. 343, Bagla Decl. in Opp. to Relator's MSJ ¶¶ 3-4).

b.    Relator's Comparison of County, State and National Discount Rates

McLean, relying on Frost's analysis, argues that the County's Discount Rate must be false because it far exceeds the state and national averages.  In an apparent effort to establish that proposition, Frost compares the County's reported Discount Rates with purported national or state averages over a period of years.  However, he does not explain why those comparisons are valid.  Here, McLean points to a Congressional Research Service (CRS) report which says that of the 500,000 (or so) children in foster care in the United States on any given day, slightly less than half (46%) qualify for Title IV-E foster care support.  (Dkt. No. 318, Relator's RJN Vol. I-B, Ex. 24 at 3).  The report does not mention the County.  Nor does it appear to address

United States District Court

For the Northern District of California

1    the method for calculating the Discount Rate.  Instead, it discusses the use of Supplemental

2    Security Income benefits to reimburse states for child welfare.  (Id.).  Frost nonetheless appears

3    to assume, without explanation, that the 46% estimate mentioned in the CRS report validly

4    represents the national average Discount Rate and then compares it to the County's reported

5    Discount Rate (ranging from about 75% to 80% over the years).  (Dkt. No. 325, Corrected Frost

6    Decl. ¶ 25).  Relator claims that the difference between the figures must be the result of fraud

7    by the County.   However, there is no indication that Frost researched the source of the estimate

8    in the CRS report, the method by which it was derived, or the time period the estimate covered.

9                    c.      2006 Government Accountability Office Report

10          McLean has also submitted a 2006 Government Accountability Office (GAO) report,

11   which references Discount Rates reported from 2000 to 2004 by several states, including

12   California.  (Dkt. No. 316, Relator's RJN Vol. I-A, Ex. 23).  Frost apparently compared the

13   state Discount Rate data in the GAO report to the County's reported Discount Rates; and,

14   McLean contends that fraud can be the only explanation for the differences between the two.

15   Defendants' objections to the report are sustained.  But, here again, even if Frost's analysis is

16   considered, it is not apparent that he researched the source of the state numbers.  Nor does he

17   explain the statistical validity of comparing state numbers with those of the County.

18   Additionally, the GAO report itself states that California's state-wide Discount Rate in 2000

19   was 80% and 75% in 2004—figures that appear to be consistent with the County's reported

20   Discount Rate for those same years.  (Id. at 25; Dkt. No. 325, Frost Decl., Ex. 2).

21                    d.      California State Auditor Report No. 2008-002

22          McLean cites to a portion of this report stating that California lacks assurance that its

23   counties are claiming only allowable costs.  She claims that this is proof that the County is

24   claiming unallowable costs.  (See Dkt. No. 324, Rel. MSJ at 12; Dkt. No. 314, Renneisen Decl.,

25   Ex. 19).  Defendants move to strike this exhibit on relevance grounds.  The court finds

26   defendants' objections to be well-taken.  Even if the document were to be considered, however,

27   the apparent conclusion relator would have this court draw from the report—i.e., that the noted

28   general lack of assurance is attributable to any fraud by the County—is highly speculative.

United States District Court

For the Northern District of California

### 3.    Alleged Inflated Children's Shelter Counts

McLean contends that defendants falsely inflated population counts at the shelter and argues that this practice, in turn, falsely inflated the County's Discount Rate used to claim federal reimbursement of foster care administrative costs under Title IV-E.  As an example, McLean says that with respect to her own children, the state juvenile court concluded that the County did not properly remove them from home—a finding that McLean says was echoed by Judge Fogel in her subsequent federal civil rights lawsuit against the County.  (See Dkt. No. 333 McLean Decl. ¶¶ 7-8; Dkt. No. 339 Renneisen Decl. ISO Opp. to Defs' MSJ, Ex. 91 at 87; Dkt. No. 345 Relator RJN, Ex. 131).  As discussed above, however, the record presented indicates that McLean's children were placed in emergency shelter; such costs are reimbursed through funds under TANF, not Title IV-E foster care; and McLean has presented no authority that the "reasonable efforts" requirement applies.  And, there is no indication that the County submitted false claims under TANF or Title IV-E in connection with relator's children's stay at the Children's Shelter.

### 4.    Alleged Unnecessary Removal of Children from their Homes

McLean maintains that the falsity of the County's reported Discount Rate is evidenced by the unnecessary removal of children from their homes.  As noted above, she essentially claims that the County improperly removes children from their homes in order to claim more federal funds for reimbursement of foster care administrative costs.  Here, relator says that she has amassed proof that the County has a practice of removing children from their home without first making "reasonable efforts" to keep the family together as required by 42 U.S.C. § 671(a)(15) and 45 C.F.R. § 1356.21.

#### a.    Child Welfare Services/Case Management System

According to McLean, information from the County's Child Welfare Services/Case Management System (CWS/CMS) database indicates that the County removes children from their home at an astonishingly high rate—a rate she believes cannot be justified given County demographics that she says show that County residents, on average, are relatively well-off.  The CWS/CMS database is a statewide database used to track children with respect to allegations of

1    abuse and neglect, juvenile dependency, child welfare services and out-of-home placement.

2    Essentially, McLean says that, based on case count information gleaned from CWS/CMS

3    reports, the County falsely inflates the number of children eligible for AFDC (Aid to Families

4    with Dependent Children), which in turn falsely inflates the Discount Rate used for claiming

5    purposes.

6        Relator presents the declaration of Judith Boring, a former County employee who says

7    that she worked on the development of CWS/CMS.  Boring provides background information

8    about the system and then generally asserts that her "department would extract data from

9    CWS/CMS and provide reports to the fiscal department for its use in the claiming process."

10   (Dkt. No. 337, Boring Decl. ¶ 12).  Boring does not, however, testify that AFDC count

11   information was provided to the County's fiscal department for claiming purposes.  There is

12   nothing in Boring's declaration establishing that she is knowledgeable about the County's

13   claiming process.  Indeed, Boring expressly disclaims any responsibilities in the preparation of

14   the County's quarterly claims and says that her department was not involved in the submission

15   of claims for federal or state funding.  (Id.).  Moreover, the County has presented the

16   declaration of Stanley Lee, a County Social Services Program Manager who says he is familiar

17   with the manner in which County employees enter AFDC status data in the CWS/CMS

18   database.  According to Lee, AFDC eligibility is not determined in CWS/CMS, and the

19   County's fiscal department does not use CWS/CMS AFDC information for claiming purposes.

20   (Dkt. No. 354 Lee Decl. ¶¶ 3-4).

21       McLean next asserts that analysis of the County's child welfare data with state averages

22   contained in the CWS/CMS Dynamic Report System show that the County's data is inflated.

23   Data in the CWS/CMS Dynamic Report System reportedly is compiled by the Center for Social

24   Services Research at the University of California-Berkeley (CSSR) based on information in the

25   CWS/CMS database.  Here, McLean has, through attorney Frost, presented charts and graphs

26   summarizing and comparing the CWS/CMS Dynamic Report System information pertaining to

27   the County and compares that data with the state average (i.e., for all 58 of California's

28   counties) from 1998 to 2008.  (Dkt. No. 325, Frost Decl., Exs. 7 and 12-15).  The upshot, says

United States District Court

For the Northern District of California

1    McLean, is that these charts and graphs show that while the County had "allegations" and

2    "substantiation" rates at or below the state average, the County's rate for removing children

3    from their home and placing them in foster care, as a percentage of "allegations," is well above

4    the state average.  Thus, she argues, the County does not use required "reasonable efforts" to

5    keep families together and then concludes that the County must be submitting improper (i.e.,

6    false) claims for Title IV-E reimbursement in cases where "reasonable efforts" were not made.

7           As with Frost's analysis of the Discount Rate calculation, defendants contend that the

8    analysis here is entirely speculative.  The terms "allegations," "substantiations," and "entries"

9    are not defined or explained by McLean.  Although the information reportedly is based on

10   information in the state's CWS/CMS database, defendants point out that relator has not

11   provided information about the manner in which all state counties report their information.

12   And, as defendants note, the CWS/CMS Dynamic Report System used by McLean appears to

13   show that (1) other counties also reported higher percentages of entries per substantiation than

14   the state average and that of the County—i.e., 23 counties in 2004, 16 counties in 2005; 14

15   counties in 2006; 22 counties in 2007; and 10 counties in 2008; and (2) the County's rate of

16   entries per child population is consistently less than the state average.  (See Dkt. No. 342,

17   Schmid Decl., ISO Opp. to Relator's MSJ, ¶ 4 and Ex. E).

18                 b.    Baiza, Jones, Koons, and McLean Declarations

19          McLean has also submitted her own declaration, as well as declarations from several

20   former County employees who essentially opine that the County unnecessarily removes

21   children from their home:

22          •    Noemi Baiza, a retired Santa Clara County DFCS social worker, states that the

23               County removed Hispanic and African-American children from their homes at a

24               higher rate than Caucasian children.  She also opines that County social workers

25               do not always use reasonable efforts before removing children from their home.

26               (Dkt. No. 336).

27          •    Nedra Jones, former County Ombudsperson, states that the County was

28               culturally insensitive and removed Hispanic and African-American children

28

United States District Court

For the Northern District of California

from their homes too quickly.  She also opines that County social workers do not always use reasonable efforts before removing children from their home.  (Dkt. No. 338).

• Teresa Koons, who worked as a court assistant at the Santa Clara County Juvenile Dependency Court from 1996-2003, says that court clerks tended to automatically check the line on minute orders indicating that "reasonable efforts" had been made and that the juvenile court minute orders may not accurately reflect the judge's actual findings on that issue.  (Dkt. No. 335).

• McLean recounts her experience with her own children's placement in the Children's Shelter.  She also says that through her interviews with others (namely, Baiza, Jones, Koons, and others), she believes that the County unnecessarily removes children from their homes without making reasonable efforts to preserve family unity.  (Dkt. No. 333).

Defendants move to strike these declarations; and, the court agrees that this testimony is irrelevant, is hearsay, or lacks foundation.  Even if the declarations are considered, however, they do not raise a genuine issue of material fact that defendants fraudulently billed the federal government by unnecessarily removing children from their homes.  For the reasons explained above, McLean's testimony about her own children is irrelevant because they were not placed in foster care, and there is no evidence that the County claimed (falsely or otherwise) federal reimbursement for their stay at the Children's Shelter.  The remainder of McLean's testimony is either hearsay or lacks foundation.  At best, Koons' testimony suggests that there are issues with respect to the accuracy of the state juvenile court's own documentation of its findings. Relator herself reportedly obtained a number of files directly from the state juvenile court.  She has not, however, presented evidence indicating that the County obtained federal reimbursement for foster care costs without use of reasonable efforts or a judicial determination of reasonable efforts.  Neither Jones nor Baiza cite a specific example of a removal that was not paired with a judicial finding that pre-removal "reasonable efforts" had been made.  To the extent they both relied on Frost's analysis of CWS/CMS data for their opinions, the court finds their conclusions

United States District Court

For the Northern District of California

1   to be unreliable for the reasons stated above.  Moreover, the County has presented the

2   declaration of Gerardo Silva, the County Social Services Program Manager who supervises the

3   unit responsible for determining Title IV-E Foster Care eligibility for individual cases.

4   According to Silva, (1) as part of the eligibility determination, the County does verify that the

5   court has made a finding that pre-removal "reasonable efforts" were made before designating

6   any child eligible for federal funds for foster care under Title IV-E; and (2) verification is made

7   when a copy of the court's finding of reasonable efforts is placed in the child's eligibility case

8   file.  (Dkt. No. 355, Silva Decl. ¶ 3).  Relator has presented no authority to suggest that the

9   County is obliged to investigate the validity of the state court's records or its "reasonable

10  efforts" determinations.

11                     c.     U.S. Census Data

12          McLean also contends that the County has a practice of reporting high population counts

13  for its Children's Shelter and that these counts are contrary to U.S. Census data.  According to

14  McLean, this practice also shows that the County's reported Discount Rate is false.  These

15  allegations appear to be based on Frost's comparisons of data from the County's monthly

16  statistical summaries of the shelter's population counts and point-in-time shelter counts she says

17  she obtained from the CWS/CMS Dynamic Report System.  (See Dkt. No. 334, Frost Decl. ¶¶

18  36-38).  According to defendants, the County's monthly summaries track cumulative

19  admissions for the period covered by the summary.  (See Dkt. No. 319, Relator's RJN Vol. I-E,

20  Ex. 27).  By contrast, the point-in-time data used in the CWS/CMS Dynamic Report System

21  appears to concern "all children who have an open placement episode in the CWS/CMS

22  system" on "the user-specified count day."  (Dkt. No. 342, Schmid Decl. ISO Opp. to Relator's

23  MSJ, Ex. H).  Frost has not satisfactorily explained how or why monthly population counts can

24  be reconciled with point-in-time counts.

25          5.     County Documentation

26          Finally, relator contends that the County has no documentation establishing that pre-

27  removal reasonable efforts were made in any given case.

28

30

1    a.    <u>Children of Color Study</u>

2         McLean argues that a study conducted by the Child Welfare Research Team at San Jose

3    State University shows that the County was "unable to substantiate 40.6% of its foster care

4    cases with files showing eligibility for Title IV-E funds." (Dkt. No. 324, Relator's MSJ at 17).

5    She contends that this study is proof that the County has not only falsely inflated its Discount

6    Rate, it has also failed to comply with federal regulations governing document retention in cases

7    where Title IV-E funds were claimed.  The court finds nothing in the submitted portion of the

8    study to substantiate McLean's inference, nor anything giving rise to a triable fact as to the

9    same.

10         The study in question, titled "An Evaluation of Factors Related to the Disproportionate

11   Representation of Children of Color in Santa Clara County's Child Welfare System." (Dkt. No.

12   342, Schmid Decl. ISO Opp. to Relator's MSJ, Ex. F).  The study was conducted in phases over

13   several years. (<u>Id.</u>).  Phase 2 apparently concerned child and family characteristics and

14   pathways through the child welfare system. (<u>Id.</u>, Ex. G).  The Phase 2 Final Report indicates

15   that 40.6% of a group of closed files requested from the County by the researchers were

16   "missing or unavailable." (<u>Id.</u>, Ex. G at 24).  There is no explanation why those closed files

17   were missing.  The report notes that a "substantial amount of data" nonetheless was available

18   through CWS/CMS. (<u>Id.</u>, Ex. G at 25-26).  Relator does not point to anything in the study that

19   concerns Title IV-E eligibility or the Discount Rate.  Nor does this court find that the portions

20   of the study she cites give rise to a triable issue that the County "was unable to substantiate

21   40.6% of its closed foster care cases with files showing eligibility," as McLean asserts.

22   b.    <u>2007 Single Audit Report</u>

23         McLean also argues that a 2007 Single Audit Report of the County's fiscal procedures,

24   which reportedly found discrepancies in eligibility determinations made in 9 of the 45 files

25   audited, shows that the County has not maintained proper documentation as to its eligibility

26   determinations.  McLean, however, failed to submit a copy of the report with her motion.

27   Instead, she slipped it into the record on her motion as part of her "Appendix of State

28

United States District Court
For the Northern District of California

1   Authorities" filed after briefing closed.[11]  Defendants move to strike the report and all mention

2   of it on that basis.  McLean did, however, submit a copy of (excerpts of) the same report in her

3   opposition to defendants' summary judgment motion.  (See Dkt. No. 339, Renneisen Decl. ISO

4   Opp. to Defts' MSJ, Ex. 98.C).  The court therefore has considered the timely submitted

5   document.  The deficiencies noted in the audit report as to eligibility determinations appear to

6   concern (1) the untimeliness of review of determinations re foster care eligibility and (2) in a

7   single instance, the lack of one form indicating that a requisite criminal background check had

8   been completed.  (See id. at 120-21).  The report does not raise a genuine issue of material fact

9   as to relator's allegation that the County has fraudulently inflated eligibility ratios for the

10  purpose of claiming increased federal funds.

11                                              CONCLUSION

12          The instant action is not the typical *qui tam* lawsuit filed by a relator who was an insider

13  privy to, or involved in, the alleged misdeeds.  Instead, McLean is an outsider-looking-in.

14  While this court previously declined to find that McLean's status as an outsider precluded her,

15  as a matter of law, from pursuing a *qui tam* action, the court also noted that it remained to be

16  seen whether McLean would actually succeed in proving her claims.  By McLean's own

17  account, the instant lawsuit was born out of her experience with the County's removal of her

18  children from their home.  A stray remark in a social worker's journal equating the McLean

19  family and its two children as the time-intensive equivalent of a family with five children

20  sparked the notion that the County was fudging numbers when it sought reimbursement from

21  the state and federal governments for child welfare services.

22

23

24          [11]     Indeed, relator submitted a host of documents—reports, studies, manuals, and
    other similar documents—as part of her purported "appendices" of federal and state
25  authorities.  These documents were not properly authenticated.  And, as noted above, they
    were all submitted after briefing on summary judgment closed.  Defendants' motion to strike
26  these materials is granted.  Unless they are copies of materials which were otherwise timely
    and properly submitted, the court has not considered relator's appendices Tabs 12-15, 17-23,
27  25, 29-31, 31A, 32-33, 36-37, 37.A-37.C, 38, and 40-42.  Additionally, defendants' motion
    to strike references to California's Cost Allocation Plan and to a County "Manual of Policies
28  and Procedures" (Rel. MSJ pp. 10-12, 21), which were not included as exhibits to relator's
    motion, is granted.

United States District Court

For the Northern District of California

1    At a macro level, relator's allegations have always been about alleged misbillings.  But,

2    the theories asserted in the original complaint apparently did not pan out in discovery, and as

3    discussed above, they seem to have been abandoned.  McLean then sought to refine her original

4    allegations in an Amendment to Complaint (at least, that is the way the Amendment to

5    Complaint was pitched to the court).  At a high level, that amendment also concerned alleged

6    fraudulent billings to the federal and state governments.  However, it seems that relator did not

7    merely "fine tune" her original allegations.  Instead, the Amendment to Complaint appeared to

8    present an entirely new factual predicate for liability.  And now, the amendment is being used

9    as a crutch to support a new factual theory, belatedly disclosed at the summary judgment stage.

10   In sum, in the years that this litigation has been pending, it seems that McLean, an outsider with

11   a festering grievance with the County's child welfare services, has embarked on a crusade to try

12   to develop evidence of wrongdoing she is convinced must exist.  The issue here, however, is not

13   whether her children properly were removed from her home.  The only issue is whether relator

14   has offered evidence that would support a reasonable jury finding that the County falsely

15   claimed federal reimbursement for child welfare costs.  Was there that evidence?

16   Despite the volume of the proffered, so-called "evidence" of the alleged false claims,

17   relator's various theories of liability are either unsupported or appear to be based on misguided

18   analyses, which strain reason to extrapolate into an alleged fraudulent practice.  The evidence

19   which gets the closest to being on point lacks foundation or is hearsay.  In the six years since

20   she filed this action, relator's quest has produced seemingly unconnected anecdotal and highly

21   speculative stories from people who did not know how reimbursement requests were calculated,

22   coupled with complex, contrived comparative analyses of statistical data without establishing a

23   foundation that the data actually was comparable.  In short, relator has not presented a genuine

24   issue of material fact that defendants engaged in any fraud in its claims for federal

25   reimbursement for child welfare costs.

26   Accordingly, defendants' motion for summary judgment on the basis of the public

27   disclosure bar is denied, but is granted on all other grounds.  Relator's cross-motion for

28   summary judgment is denied.

United States District Court

For the Northern District of California

1      RELATOR'S ALTERNATIVE MOTIONS FOR RELIEF

2   A.      Motion to Re-Open Discovery

3          McLean has filed an alternate motion for relief pursuant to Fed. R. Civ. P. 56(d).  In

4   essence, she requests that if the court is inclined to grant defendants' summary judgment motion

5   (i.e., if it finds her opposition unconvincing), then the court should defer ruling on the matter,

6   re-open discovery, and allow her to take additional discovery on a number of issues.  (Dkt. No.

7   373).  That is not what Fed. R. Civ. P. 56 provides.  See Fed. R. Civ. P. 56(d) (stating that the

8   court may defer ruling on summary judgment and allow time for discovery "[i]f a nonmovant

9   shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to

10  justify its opposition.").  Moreover, as noted above, defendants' summary judgment motion was

11  filed in 2008 and held in abeyance while the parties wrangled over discovery matters.  McLean

12  had a nearly two-year preview of the issues raised by defendants' motion.  Her alternative

13  motion for leave to conduct additional discovery is denied.

14  B.      Relator's Motion to Designate Additional Experts

15         McLean moves for leave to designate additional experts—namely, Joseph F. Loftus (a

16  purported expert in child welfare fiscal policies and practices) and Richard Drogin, Ph.D (a

17  statistician).  As noted above, the deadline for expert disclosures closed years ago.  McLean

18  identified, several years ago, nearly 70 individuals she intended to designate as experts.  Neither

19  Loftus nor Drogin were among them.  To be sure, following the substitution of her current

20  counsel into the case, McLean suggested that she might seek to introduce new or different

21  expert testimony.  (See Dkt. No. 288).  She was warned, however, that the court did not view

22  such statements as establishing good cause to designate additional experts at that stage of the

23  litigation.  (Dkt. No. 305).  It was not until briefing on the parties' substantial summary

24  judgment submissions closed that McLean made the instant belated, after-the-fact request to

25  rely upon the purported expertise of Loftus and Drogin.

26         If a party fails to make disclosures as required by Fed. R. Civ. P. 26(a), that party is not

27  allowed to use the witness or information to supply evidence on a motion, at a hearing, or at

28

United States District Court

For the Northern District of California

1    trial, unless the failure was substantially justified or is harmless.  FED. R. CIV. P. 37(c)(1); Yeti

2    by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1106 (9th Cir. 2001).

3         Relator contends that the two-year delay in disclosing Loftus and Drogin is substantially

4    justified because she needed their expertise to (1) rebut expert opinions offered by defendants in

5    their summary judgment motion and (2) counter statements presented by defendants in

6    opposition to her own summary judgment motion.  Although some of defendants' percipient

7    witnesses had previously been designated as experts, defendants chose to withdraw virtually all

8    of their expert designations shortly after relator's current counsel substituted into the case.  And,

9    as noted above, defendants did not present any expert evidence in their summary judgment

10   motion.  Moreover, as discussed above, having had a two-year preview of the County's

11   summary judgment arguments, McLean has not satisfactorily explained why she waited until

12   after summary judgment briefing closed to seek leave to designate Loftus and Drogin.  As for

13   relator's contention that she could not have anticipated arguments made by defendants in

14   opposition to her own summary judgment motion—as discussed above, it appears to this court

15   that it was relator who disclosed new factual allegations underlying her claims of fraud at the

16   summary judgment stage.

17        McLean nonetheless argues that, because no trial date has been set, any harm to

18   defendants may be cured by allowing additional time for proper expert disclosures and expert

19   discovery.  The court disagrees.  First, as noted above, trial dates have been set and re-set more

20   than once over the past six years, primarily to accommodate relator's frequent changes in

21   counsel and her repeated requests for additional discovery as to her seemingly ever-shifting

22   theories of liability.  While the interest in resolving cases on the merits favors McLean, the

23   court has striven to give her ample opportunity to conduct the discovery she said she needed, at

24   the repeated expense of the court's interest in managing its docket and the public's interest in

25   the efficient resolution of cases.  Moreover, the court finds that there was palpable prejudice to

26   defendants, who were essentially forced to address the opinions of McLean's undisclosed

27   experts for the first time on summary judgment.

28

1       In sum, relator's failure to timely and properly disclose Loftus and Drogin is neither

2  substantially justified nor harmless.  McLean's motion to belatedly designate them as experts is

3  denied, and defendants' related motions to strike Loftus' declarations are granted.

4  C.     <u>Relator's Alternative Motion to Transfer Case for Trial</u>

5       McLean's alternative motion to transfer this case for trial to the court's San Francisco

6  Division is denied as moot.

7  ORDER

8       Based on the foregoing, defendants' motion for summary judgment on the basis of the

9  public disclosure bar is denied, but is granted on all other grounds.  Relator's cross-motion for

10  summary judgment is denied, as are her alternative motions for relief.  The clerk shall enter

11  judgment and close the file.

12       SO ORDERED.

13  Dated: October 31, 2011

14  _____

15  HOWARD R. LLOYD
   UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

1

ADDENDUM:   DEFENDANTS' EVIDENTIARY OBJECTIONS

2

Dkt. No. 314 Renneisen Declaration

3

• Ex. 19: Sustained.  Fed. R. Evid. 401, 402, 801(c)

4

• Ex. 20:

5

—Children of Color Study excerpts: Sustained.  Fed. R. Evid. 401, 402, 901, 801(c)

6

—Baiza Deposition excerpts: Sustained.  Fed. R. Evid. 401, 402, 901

7

• Ex. 21: Sustained.  Fed. R. Evid. 801(c), 901

8

9

Dkt. No. 315 Relator RJN, Vol. II.

10

• Exs. 28-51: Sustained.  Fed. R. Evid. 401, 402

11

• Exs. 52-61: Sustained.  Fed. R. Evid. 401, 402, 801(c), 901

12

13

Dkt. No. 316, Relator's RJN, Vol. I-A (Ex. 23): Sustained.  Fed. R. Evid. 401, 402, 801(c)

14

15

Dkt. No. 318, Relator's RJN Vol. I-B (Ex. 24): Sustained. Fed. R. Evid. 401, 402, 801(c)

16

17

Dkt. Nos. 319, Relator's RJN Vol. I-E (Ex. 27): Sustained. Fed. R. Evid. 401, 402

18

19

Dkt. No. 325 (Corrected) Frost Declaration
& Exs. 2-18:

20

Sustained.  Fed. R. Evid. 401, 402, 702, 703, 801(c), 901, 1006; Fed. R. Civ. P. 26(a) and 37(c)(1)

21

Dkt. No. 333 McLean Declaration

22

¶ 12, p. 3, lines 19-21: Sustained.  Fed. R. Evid. 701, 801(c)

23

¶ 14, p. 4, lines 4-7: Sustained.  Fed. R. Evid. 701

24

¶¶ 19-23: Sustained.  Fed. R. Evid. 801(c)

25

¶ 24: Sustained.  Fed. R. Evid. 701, 702

26

¶ 26, p. 6, lines 5-6: Sustained.   Fed. R. Evid. 701, 702

27

¶ 27: Sustained.  Fed. R. Evid. 401, 402, 801(c)

28

¶ 28, p. 6, line 18: Sustained.  Fed. R. Evid. 401, 402

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

| | | |
|---|---|---|
| 1 | Dkt. No. 334 Frost Declaration and Exs. 62-90: | Sustained.  Fed. R. Evid. 702, 703; Fed. R. Civ. P. 26(a) and 37(c)(1). |
| 3 | Dkt. No. 335 Koons Declaration: | Sustained.  Fed. R. Evid. 401, 402 |
| 5 | Dkt. No. 336 Baiza Declaration | |
| 6 | ¶ 10: | Sustained.  Fed. R. Evid. 701, 702 |
| 7 | ¶¶ 12-19: | Sustained.  Fed. R. Evid. 701, 702 |
| 8 | ¶¶ 20-22, 24-25: | Sustained.  Fed. R. Evid. 401, 402, 801(c) |
| 9 | ¶ 23: | Sustained.  Fed. R. Evid. 401, 402 |
| 11 | Dkt No. 337 Boring Declaration, ¶ 12: | Sustained.  Fed. R. Evid. 401, 402 |
| 13 | Dkt. No. 338 Jones Declaration: | |
| 14 | ¶¶ 4, 7-8: | Sustained.  Fed. R. Evid. 702 |
| 15 | ¶¶ 10-12: | Sustained.  Fed. R. Evid. 701, 702 |
| 16 | ¶13: | Sustained.  Fed. R. Evid. 801(c). |
| 18 | Dkt. No. 339 Renneisen Decl. Ex. 98: | Sustained.  Fed. R. Evid. 401, 402 |
| 20 | Dkt. No. 345 Relator's RJN | |
| 21 | • Exs. 99, 100: | Sustained.  Fed. R. Evid. 401, 402 |
| 22 | • Ex. 101: | Sustained.  Fed. R. Evid. 401, 402, 801(c) |
| 23 | • Exs. 102-128: | Sustained.  Fed. R. Evid. 401, 402, 801(c) |
| 24 | • Ex. 129: | Sustained.  Fed. R. Evid. 401, 402, 801(c) |
| 26 | Dkt. Nos. 346, 361 Loftus Declarations: | Sustained.  Fed. R. Civ. P. 26(a), 37(c)(1); Fed. R. Evid. 702, 703. |
| 27 | Dkt. No. 357 Frost Reply Declaration & Exs. 132-138: | Sustained.  Fed. R. Civ. P. 26(a), 37(c)(1); Fed. R. Evid. 401, 402, 702, 703. |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dkt. No. 359 Relator Reply RJN
& Exs. 142-146:

Sustained.  Fed. R. Civ. P. 26(a), 37(c)(1);
Fed. R. Evid. 401, 402, 703.

Dkt. Nos. 361-363 Relator's Appendices:

Motion to Strike granted as per Order, fn.
11

United States District Court
For the Northern District of California

1    5:05-cv-01962-HRL Notice has been electronically mailed to:

2    Gordon Wayne Renneisen     grenneisen@cornerlaw.com, kfrost@cornerlaw.com,
     pprill@cornerlaw.com

3

4    Jeremy L. Friedman     jlfried@comcast.net

     Melissa R. Kiniyalocts     melissa.kiniyalocts@cco.co.scl.ca.us,
5    marylou.gonzales@cco.sccgov.org

6    Sara McLean     sara.mclean@usdoj.gov

7    Sara Winslow     sara.winslow@usdoj.gov, kathy.terry@usdoj.gov

8    Stephen H. Schmid     stephen.schmid@cco.co.santa-clara.ca.us,
     marylou.gonzales@cco.sccgov.org

9
     William C Dresser     loofwcd@aol.com
10

11   Counsel are responsible for distributing copies of this document to co-counsel who have not
     registered for e-filing under the court's CM/ECF program.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28